I think we are now ready for our second case of this morning, United States v. Leon Dingle, Jr. and Karen Dingle. And whichever one of you wants to come first, Ms. Eisenman. Thank you, Your Honor. May it please the Court, Vanessa Eisenman on behalf of the defendant appellant, Mrs. Karen Dingle. Mrs. Dingle's appeal involves two issues, but unless the Court has any questions, I'd like to focus primarily on the first, that being whether there was sufficient evidence to affirm Mrs. Dingle's convictions for conspiracy, mail fraud, and money laundering. At trial, the jury was instructed that... Let me tell you what has been foremost in my mind about Mrs. Dingle. The move of the $20,000 of grant money into a business account, followed by a check for her son's mortgage. That's a difficult piece of evidence for Mrs. Dingle. I understand that paying bills from the business account was not illegal in and of itself. But this showed that she caused grant money to be moved into that business account first. So what I would appreciate is, what is the best innocent explanation for that sequence of events? Sure, Judge. And that was definitely something that the government focused on at trial as well. The best innocent explanation, which I think is fully supported by the record, is that Mrs. Dingle was given instructions from her husband to move that money. The testimony at trial from Ms. Kilpatrick was that only Dr. Dingle gave instructions regarding moving funds from this grant account into the operating account. But did the jury have to believe that? Because obviously the perspective we now need to take is, was there any way the jury could have understood this to be consistent with her knowledge of the conspiracy, consistent with the verdict that the jury reached? So even if there was an innocent explanation, if there was an alternative, that she was comfortable enough moving this money around herself, that she knew how to do it, that she puts it, and eventually 15,000 of it go to the son's mortgage. You're right, Judge. I was answering the judge's question. No, no, it was perfectly okay to answer the question. I think Judge Rovner, like maybe the rest of us, wondered, what is the innocent explanation? I don't think the jury had to believe that in order to have reached the correct verdict here, which is an acquittal on this count. You're right. You're absolutely right. Perhaps she didn't get direction from her husband. But the critical matter here is whether she knew or was at least deliberately avoiding that false or fraudulent statements were made in these grant documents to acquire this grant money. If she's moving funds from one account to the other, that says nothing about whether she knows that her husband and Ms. Kilpatrick have lied to the government about getting these grants in the first place. So what about these comments that she makes about the greedy comments that she makes? Yes. Why isn't that some indication that she knew about the fraud? And the government definitely emphasizes that as well, because greed is not the same thing as fraud. I think that's the most basic explanation is calling somebody greedy does not mean calling someone a liar and a thief and somebody who has cheated the government. Again, the government's burden of proof here, according to its own jury instruction, is to say that Mrs. Dingell had to know that there were lies in the grant documents or lies in the tax documents. And calling your husband greedy because he's taken his own paycheck before paying business expenses just simply cannot, it's not reasonable to infer by using the word greed. She means I know about the fraud. I know that you told the government lies in the grant documents. I know that you told the state lies in the tax documents. And I know all these things that you've deliberately excluded me from because you've been having extramarital affairs with many of these women that you've contracted with. She's not the bookkeeper. She doesn't have anything to do with the grants. So simply saying he's greedy. Isn't the evidence that Mrs. Dingell referenced grants by name in making account transfers fatal to her argument? No, it's not. And that was what Judge Rovner was talking about. She's saying that she put a notation on this $20,000 transfer that it was for this one grant, this ASPR grant. But there's no reason to believe that she knew that it wasn't having to have to do with that grant. She's not keeping the books. She doesn't know what grant expenses are being paid out of that general operating account. Her husband is the one doing all the work on the grants. Sorry, Judge. That Mr. Dingell, when he was confronted by Mrs. Dingell for being greedy, that he replied that the grants, the grant funds were his money. And his response would seem to indicate, would seem that she was aware that he considered state grant funds to be his own money. Well, why would that not be enough to show her knowledge of the scheme? Well, first of all, remember this conversation. Ms. Kilpatrick doesn't even remember the year that this conversation took place. We're going to view that in the light most favorable to the government, but I just wanted to point that out. Second of all, he never says in the testimony, he doesn't say this grant money is my money. He said, this is my money. Give it to me. And that's all we have for context here. That's one statement that they had. And again, if Mrs. Dingell doesn't know that the grants were fraudulently obtained in the first place, then she doesn't know that there's anything wrong. What if he means that he's already spent this money on grant activities? According to the government's own admission, these employees, these company employees were doing the grant activity. He was going to meetings. Mrs. Dingell is not aware of every sort of in and out of the grant expenses. She doesn't know if he's already spent that amount of money from the company funds, and she's definitely not keeping tabs on the company accounts. But she surely does know that he's spending a lot of money on personal luxuries, whether it's cars, vacations, yachts, trips to Germany, and so on. My concern is that your argument, I would do the same thing in your shoes, but your argument is looking at some of these specifics and not stepping back and realizing that the jury can, through circumstantial evidence, find either from the ostrich instruction that she was deliberately avoiding, finally connecting the last dot, or the actual knowledge. And there's a lot going on in this scenario that she does know about that's really questionable. I understand what you're saying, and I think that's probably how the jury verdict happened. They sat through seven weeks of this evidence, seven weeks of evidence against her husband, and seven weeks of the government kind of characterizing some of this evidence as, Dr. and Mrs. Dingell did this, and Dr. and Mrs. Dingell did this. And she was in the office all the time. She was not there all the time. Well, a lot. She was in the office. She worked part-time, and what she was doing in the office, and I think that's where the government's admissions kind of come into play here, and Ms. Kilpatrick's testimony. She testified for over a week against Dr. Dingell, and never once did she say that Mrs. Dingell had any knowledge about this fraud. No knowledge of the grant fraud, nothing to do with the bookkeeping, no knowledge that any taxes. Well, she didn't say she didn't have knowledge. She just didn't say she did. Correct. Correct. She said she didn't have any, she said she never pointed to Mrs. Dingell doing anything or knowing about any of the grant frauds being a part of any one of those discussions where this, where, you know, Dr. Dingell says to Ms. Kilpatrick, I'll just make the budgets work or take off our name from these grant forms. She's never even pegs her as being in the room for any of those discussions. She's also, Ms. Kilpatrick flat out says, never once did Mrs. Dingell try to falsify her tax forms. She never did anything of the sort. And again, she's not the bookkeeper. She's not keeping tabs on these accounts. Doesn't she know when she comes in with this big folder full of things that are supposedly going to be exemptions from the tax? I think they actually called it a little folder, you know. A folder, a manila folder of some size. But, yes, but that's not the critical point, of course. Yes, so she wrote down what she thought were personal business expenses that were paid from personal funds. But all she did with that little folder was hand it over to Ms. Kilpatrick and the accountant, Ms. White. And they are the ones who put it into the tax forms. Couldn't the jury have seen that as more commingling, so to speak, of the business and the personal side? No, I don't think so because she has to have this fraudulent intent. She has to, you know, we're not just talking about holding her accountable civilly for some tax discrepancies. I totally agree with that. And was she, you know, spending perhaps excessively? Yes, but it's fraudulent knowledge that she had to have. And the essential nature of this fraudulent scheme was lying in these grant documents, lying to the state about who was doing the grant work, how much they were doing, and how much they were getting paid for it. And there's just no evidence that she knew about that. What's the record evidence on the source of the funds that was not grant-related? The record evidence, and I'm sure the government will correct me if I'm wrong on the numbers here, but it was significantly less. You know, the United Armor money that they were bringing in and Mrs. Dingell's rental income, it was significantly less. Than it had been in the past? No, I believe the United Armor was only during the period of time that we're talking about. The grant money increased over time. Yes, I believe they started with the grant. That's what I'm trying to get at. Oh, sorry. The proportion of money going into the account the relevant years was primarily grant money, not these other sources of legitimate income they had had before. And I will not dispute that. But whether Mrs. Dingell has knowledge about exactly how much money is coming from which sources, you just can't find that in this record because she's not anywhere near the books. And they're doing all these grant activities that she's purposely excluded from. Okay. Sorry. No, no, that's quite all right. Thank you very much. Mr. Stiller. Good morning, and may it please the Court. Regarding the instructions given to Leon Dingell's jury, I think it's important to remember the faith that we generally place on jurors' ability to strictly obey instructions given by the Court. It's upon that faith that we believe that jurors can disregard compelling but stricken testimony. It's upon that faith that we believe that jurors can compartmentalize evidence of a defendant's horrific prior bad act as evidence for a limited purpose but not for bad character or propensity. But, Mr. Stiller, I mean, we've been through this should versus must argument before. Yes. In our pattern instructions. And I actually took the step because, you know, I try to prepare for every argument. You know, I flipped through the dictionary, looked up should, which is a word I'm sure I've known for a long time. And one of the meanings of should is must. And our court has made the decision that the jury is not going to misinterpret this instruction as thinking that, oh, well, even if it's beyond a reasonable doubt, they have an option of not convicting. We've been pretty confident. And then when the Rule 29 motion is made and review is made of the evidence, that's yet another safeguard. So I'm not sure that the case has been made, even if other circuits see this differently, for overruling Mansouri and Curley and changing out our pattern instruction. I guess that goes back to my initial point, Your Honor. Curley kind of disregards the faith that we otherwise place in jurors. Why does it? I mean, you know, you should honor your mother and father or something. It doesn't mean, you know, God was giving you an option to be disrespectful to them. You should do this. It's encouraged.  It's more than encouraged. But ultimately it's optional. No, I don't think so. I mean, I think that is the question. Is that the necessary meaning of this? I think that is the question, Your Honor. I just believe that, you know, absent evidence to the contrary from a linguist or a behavioralist, in our day-to-day lives when we use the term should, should see a dentist twice a year, should give our children a healthy breakfast, there are exceptions to those rules. My six-year-old ate chocolate pudding for breakfast last week. Normally we try and give him Cheerios or something healthy. That's what we should do. But there are exceptions to what we should do. And I believe that on this fundamentally crucial issue, the Second Circuit has it right in that must is not optional. Well, but the case in the Second Circuit wasn't dealing with the word should. It was dealing with the word may, which is a completely different thing. I don't know if you were a veteran of the Rules Committee's process of restyling various rules, but there were many discussions about may, must, should, shall, which got ditched from the rules. And should was understood to be you have to do this. That's the way the summary judgment rule was worded for three or four years. Summary judgment and reasonable doubt. There's certain issues in common, but they lack the constitutional component, and that's what's crucial here. Curley also makes mention of the facial evenhandedness of the pattern instruction. In other words, there's should convict and there's should acquit. I think that evenhandedness is facial, but it overlooks the crucial distinction that nobody's constitutional right is violated if someone whose guilt is proven beyond a reasonable doubt is not convicted. The same can't be said. Am I wrong in thinking that Leon himself or at least his trial counsel submitted to the court the very jury instruction to which there is now objection, and why would that not be a waiver of the objection? You know, his lawyer expressly agreed to the instructions as well. So is that not a waiver? Indeed, you're correct, Your Honor. As the government points out in its brief, Dr. Dingell was a proponent of essentially the pattern language. As I've tried to articulate in my reply brief, to waive something as opposed to forfeit it requires some purposeful and intentional conduct. I'm not sure that the record here indicates that by sort of the passive reliance on the status quo, that being the pattern instructions blessed by this court in Curley and in Mansouri, that defense counsel or trial counsel was communicating an affirmative preference for should rather than must. It's different than the Trudeau situation in which the record showed that defense counsel there wrestled with the government and wrestled with the district court to get the language that he then complained about on appeal. But that would eliminate the waiver rule for jury instructions, because the only reason somebody would be complaining on appeal about an instruction is that they've now, upon reflection, discovered some problem with it that they didn't appreciate was there when they said it was okay. So your rule really would be you can never do more than forfeit on a jury instruction. I disagree. If there's an affirmative invitation to the error later complained about, affirmative. Judge, this is what I want. I understand my options, A versus B, and I want B. That waives the ability to complain about B. But Mansouri, it was an unpreserved claim of error, and the court went with forfeiture rather than waiver, and that's what I'm suggesting on behalf of Dr. Dingell. It's maybe a good time to pivot to the claims of sentencing error, and there- Well, wasn't waiver there as well? The court asked the Garcia-Segura question, and counsel represented that the arguments had been adequately addressed.  Thank you, Your Honor. I think we need to bifurcate or perhaps triangulate the claims of sentencing error that Dingell is now making. The Garcia-Segura waiver applies only to claims of Cunningham error. That is, that the court passed a non-frivolous argument over in silence. Dingell on appeal is only making one claim of Cunningham error, which pertains to the district court having passed over in silence his claim that the fact that he had set aside roughly $1.1 million of advanced funds towards restitution was a mitigating concern. On that, as my reply brief tries to explain- Well, the judge says something about it. He's considered Leon's ability to pay restitution by selling legitimately obtained assets. I know it's not fulsome, but there's a nod. It was mentioned in the context of I've read the sentencing submission, and these are the claims being advanced, yes. But that was the full extent of the district court's discussion of the restitution issue, and we do believe that that came in violation of Cunningham. That itself justifies the sentence being vacated and remanded. And going back to Judge Rovner's question about Garcia-Segura, as my reply brief indicates, the colloquy occurred too late. The appellate advisement had already been given. Trial counsel had moved to withdraw. We were fussing and trying to figure out who's going to notice the appeal and what about his inform-a-pauperous status and so on and so forth. And only after sort of all that smoke had cleared and dust had settled did counsel for the government remind Judge Mills that that question needed to be asked. Where does it say that's too late? I mean, if the judge is asking the question, then what reason do we have if somebody had spoken up and said, you know, I don't think you paid enough attention to restitution, that he wouldn't have circled back and tried to do so? I think it's Garcia-Segura itself that states that the magic word question has to be asked, obviously after the pronouncement of the sentence, but before the appellate advisement. And that honors the general principle that we're not requiring people to take exception to sentences for purposes of the record. Beyond the silence with respect to the restitution issue, which, again, I believe itself justifies that the sentence be vacated, I think this is an opportunity for this court to speak to the perils of a stock application of general deterrence as sort of a trump to a defendant's mitigation. Are you arguing that general deterrence is just inherently an inappropriate consideration since it's not focused on this defendant, or are you arguing something more narrow? I'm arguing that in this case, the judge's consideration of Dr. Dingell's age and, by extension, mortality, wasn't sufficiently thoughtful and individualized, given the manner in which general deterrence was applied in stock fashion to essentially trump the mitigation. Judge Mills gave some indication that, yes, I understand that this is unusual. You are a 78-year-old man, and that doesn't happen every day in this court. But to give you a substantial sentence reduction would send a message to people of a certain age that extensive frauds won't be taken this seriously. So Judge Mills was focused on a particular audience, not just business people or people dealing with government funds. It's people of a certain age, and here I see that I'm out of time. The certain age was 78 years of age. So the question needed to be asked, how big is that audience as it relates to how important general deterrence is, and is that group of people, is a lengthy sentence necessary to deter that group, however big or small? Thank you. Okay, thank you very much. Mr. Bass. Thank you, Your Honor. Good morning. May it please the Court. Timothy Bass on behalf of the United States. Your Honor, if I could first address Mrs. Dingell's appeal, and Judge Rovner to answer your question and also Judge Williams to answer your question. Judge Rovner, you asked the question, what is the best innocent explanation for that $20,000 transfer? Judge Williams, you asked if the notation on the transfer as asked for admin expense was fatal to her argument. And I would submit that the answer to Judge Rovner's question is there is no innocent explanation, but the mere asking of that question resolves this appeal, because the question on appeal is not whether there's an innocent explanation for the evidence. The question is whether there's some evidence to support the conviction, or more specifically whether the record is devoid of evidence to support the conviction. And, Your Honor, I would submit to you that your asking that question answers this appeal. But what evidence is there that she was doing things any differently than she did when he was allegedly running a legitimate consulting business? I mean, was she writing more checks? Was she spending more time at the office? Was she spending more money than she had in the past? Spent more money than she had legitimately obtained? I mean, you can see that we are troubled. Your Honor, I appreciate the question, and I will answer it. But I would simply, if I could, simply state that counsel has done an admirable job in advancing this appeal, but she's simply rehashing the very closing arguments that were submitted to the jury, and it was for the jury to answer those questions. Well, but it's not entirely. And so here's my, I think, Judge, everybody's moving in this direction. Suppose that this is before the fraudulent enterprise begins, and Mrs. Dingell is there, and she takes $20,000 from a corporate bank account, and she moves it over, and she uses it to pay a relative's mortgage. Well, you might have a problem of corporate law involved there. You might have some issue about, you know, commingling of corporate and personal assets. I can think of various things that you would have. But one of them is not that you're defrauding the government. I mean, you know, you're just, as many small business owners are, you're being kind of sloppy with the books is what's happening. And I think the question here is, when we look at this $20,000, of which $15,000 goes to the son's mortgage, are we looking at being sloppy with the books, or are we looking at her actually realizing that there's this fraudulent effort to siphon money from grants that are being received for, you know, HIV education, all the rest of the things these grants were supposed to go for? Where's the evidence that pushes it over the line? Your Honor, I totally agree that sloppy bookkeeping does not equate to mail fraud. Good. So we're on the same page there. Moreover, if the mail fraud or wire fraud statute said, in order to convict a defendant of those offenses, he or she must either fully be aware of the scheme or fully participate in the scheme, we wouldn't be here. But that's not what the mail fraud statute says. That's not what this Court has repeatedly said. In fact, this Court has repeatedly said that a single act can constitute the offense. And the single act here was not just the transfer of the $20,000 to another account and then directing Ms. Kilpatrick to apply those funds or $15,000 of those funds on her son's mortgage. But the evidence put Mrs. Dingell in front of a computer, and it put her not only transferring the funds but making a false statement in doing so. She inputted into that transfer that the purpose of the transfer was for the ASPR grant admin. Now, so the distinction between what you're asking me and what the evidence was is a transfer coupled with a false statement. That's mail fraud. And somehow that false statement tells us that she knows about this scheme? Well, let me answer. Particularly when we look at the backdrop of this, because the evidence did show that Dingell had reasons to hide information about the grant scheme from Mrs. Dingell because of the extramarital affairs, right? That was evidence. He certainly took steps to hide his relationships with these other women. There's no question about that. Yeah, and part of the other women was they were all involved in the grant scheme, and so he wasn't sharing any of that with Mrs. Dingell in terms of what the evidence is in the record, right? Your Honor, he certainly was hiding his extramarital relationships with the other women, but he wasn't hiding anything else. How do you know that? I mean, what's the record evidence on? I mean, that's the problem. How do you know that in terms of the various documents that were submitted that were fraudulent? And there's a ton of evidence on him, but, you know, very light on her. I'm happy to answer that, Your Honor. As you mentioned, the backdrop, and here's the backdrop. As you also inquired of counsel, on at least three occasions, Mrs. Dingell and Ms. Kilpatrick confronted Mr. Dingell about his greed. Now, I agree that greed doesn't necessarily equate to fraudulent intent, but it's some evidence. Three occasions, one of which Mr. Dingell was asking Ms. Kilpatrick to transfer to him directly $100,000. In addition, $440,000 of the $2.6 million out of the $10 million total, $10 million total, $2.6 million of that $10 million was written directly to Mr. and Mrs. Dingell. Of the $2.1 million, $2.6 million. Mr. and Mrs., so did she have to endorse a check or something? Well, of the $2.6 million, Your Honor, $440,000 in checks were written directly to Karen Dingell. They were written to her and only to her, and she cashed them. In addition, she personally benefited from the other $2.1 million in checks that were written to Leon Dingell because those checks were deposited in the personal bank account, and then Mrs. Dingell wrote checks off of that account. In total, 915 checks Mrs. Dingell signed, totaling $1.7 million for the payment of largely their personal expenses. Of course, it's not your position that any time an individual is an intended beneficiary of a conspiracy that he or she is part of it, right? Agreed, Your Honor, but there were three aspects to this scheme, and the settled law is that a defendant in a conspiracy or a scheme does not need to participate in all aspects of it, does not need to know all the other co-conspirators or co-conspirators, does not need to be a participant during the entire period. The three aspects of this scheme were the fraudulent acquisition of the funds, the fraudulent conversion of the funds to personal use, and the fraudulent retention of the funds by filing false tax returns. Mrs. Dingell participated in two of those three. Every time she wrote a check, every time there were grant funds issued to her to which she was not entitled, she was participating in the fraudulent conversion of the funds. Well, if she knew that there was something wrong, I mean, if he had been a very successful hedge fund manager or something, then I guess money would have poured into the accounts. She could have written the same 915 checks. I mean, some people are very wealthy, right? So they write checks for a lot of things if people still write actual checks. So don't you need to kind of nail down somehow, I mean, my understanding is the government's theory is from the ostrich instruction that as these pennies from heaven are flowing in, you know, she should have been aware that there was something wrong with them. But I'm trying to understand why she should have been aware. Well, Your Honor, there are two theories that we advanced, and Judge Mills noted, as this court has stated previously, that the government need not prove both, but it may rely on both. One was just the direct evidence of her participation, and we didn't have to prove that she participated in all aspects of the scheme. On the ostrich instruction, it is true. Following this court's caution and using that instruction sparingly, the instruction did say that if the jury were to find Mrs. Dingell guilty based on a deliberate avoidance theory, it must find that she was aware that the grant funds were fraudulently obtained, that there were false statements made to the Department of Public Health. And I would submit to you that there was certainly some evidence, some circumstantial evidence, including the fact that she was there in the office for more than 20 years. She participated in some of the letter writing, and she even wrote a letter on behalf of Broadcast Ministers Alliance purporting to be writing on behalf of the grantee. There was some evidence that she was aware, and then again the confrontation of Mr. Dingell about his greed. There was some evidence, Your Honor, I would suggest to you, that she was aware or at least had a strong suspicion. But if you throw aside. What's the change in how much she did from, you know, from the start of her being involved in the business to the end? In other words, as things became more fraudulent, was she doing more? Your Honor, I think the answer to that question is that her involvement, her activity remained fairly constant throughout the time period of the charged conspiracy because she was in the office regularly. She did consistently throughout the time period of the scheme and conspiracy write checks for personal expenses and receive checks made out directly to her. She, as I mentioned, she did some of the letter writing for Dr. Dingell. And here's another in the litany of the summary of evidence that I was providing, Your Honor. She agreed with Mrs. Kilpatrick not to pay the sales taxes, knowing that they had sufficient funds to do so. And then she knew that the false. Yeah, this is just when they said, oh, let's not hassle with the sales taxes now. Correct. And then she knew that false tax returns, false sales tax returns, would then be submitted to the State of Illinois as a result. More importantly. So the tax returns are false because they say zero sales are made and therefore zero sales taxes. Exactly. And we did not charge Mrs. Dingell with all the mail fraud counts that Dr. Dingell was. Right. We charged her with only those mail fraud and only those mailings that had to do with the mailing of the tax returns. And another piece of evidence was that in 2009, when the grand jury investigation became overt and a grand jury subpoena was issued to OSSI, the acronym for the Dingell's business, Mrs. Kilpatrick testified that she had a conversation with Barbara White, the accountant, and Mr. and Mrs. Dingell about the payment of personal expenses or the deduction of personal expenses and some of the adjustments to their tax preparation that needed to be addressed. And yet after the issuance of that grand jury subpoena in 2009, Mrs. Dingell directed Mrs. Kilpatrick to sign the Dingell's names to their 2009 tax returns that were filed in 2010. And the 2009 tax return was also false because it continued to deduct personal expenses that Mrs. Dingell, along with Dr. Dingell, paid from income. Now, that is roughly eight to ten examples of the evidence, of some evidence of the fact that the record is not devoid of evidence that the jury could find Mrs. Dingell guilty beyond a reasonable doubt. And again, Your Honors, I appreciate the questions you have about Mrs. Dingell. There's no question that her level of culpability was far less than Dr. Dingell. But culpability is not a question for the jury to answer. That's a question at sentencing. And Judge Mills, and if I could turn to the sentencing issue as to Mrs. Dingell, Judge Mills and the government itself addressed that difference in culpability at sentencing. So he gives her the four levels down from minimal. Correct. First, Your Honor, Dr. and Mrs. Dingell agreed that the loss amount was appropriate, specifically agreed to it. Mrs. Dingell personally benefited from at least $1.5 million of the loss. The loss range was 1.5, I believe, to 2.5 or 3, but they specifically agreed to it. And then thereafter, the government agreed that Mrs. Dingell, because of the difference in culpability, should receive a four-level reduction in her offense level as a minimal participant. And finally, Judge Mills, after considering the difference in culpability, imposed a below-guideline sentence, as he did with Dr. Dingell. Now, to my knowledge, Your Honor, this Court has never reversed a sentence as unreasonable, a below-guideline sentence as unreasonable. It has never done so. Now, that doesn't mean that it would not in an appropriate case, but I would submit that this is not such a case. And so if I could, Your Honor, just return one last point to how this argument began, Judge Rodner's questions and Judge Williams' questions. I appreciate the questions, but I would submit that the mere asking of those questions answers the appeal as far as the sufficiency of the evidence claim. The evidence, there was some evidence, and in Judge Mills' view, overwhelming evidence, as to both defendants. Recognizing that their culpability was significantly different, the evidence as to both of them was overwhelming. For that reason, we would ask that the conviction of Mrs. Dingell and Dr. Dingell be affirmed. Finally, Your Honor, you did not ask a question about the admission of evidence, extramarital affair evidence. My only question about that is why did the government throw in those other four women? Because in your initial motion, you mentioned the two, which certainly would have driven the point home, and then you kind of went the extra mile, so to speak, with the others. Your Honor, one of the things I've learned being privileged before this court for many years is in order to be a good trial lawyer, you must be a good appellate lawyer, and you must be prepared to defend on appeal what you did in the trial court. And I remember several years ago standing here before you and having to defend a 404B evidence question that Your Honor asked me. And when you used the word propensity, and I responded by saying that's sort of a bomb word. And so the question here is the same. What we addressed with respect to this evidence, first of all, can the government do it? Should the government do it? And did the government do it? And the evidence of Dr. Dingell's personal relationships with these other women was not submitted in a vacuum. There was evidence of his personal relationships with the directors of public health. There was evidence of his relationship with Dr. Hickenbottom, his friend and personal doctor, and the fact that he was lying to these people that he himself was a medical doctor. And it was within that context of Dr. Dingell's access, influence, and personal relationships that his personal, his extramarital relationships with these women was so probative. And we presented that question to Judge Mills, and he concluded that the evidence was significantly probative. Now, in hindsight, Your Honor, it may be that the question as to Arletta Smith, as to why she left because Dr. Dingell asked her about her sweater, it may be that that question, in hindsight, shouldn't have been asked. And I would simply respond to that by saying that it certainly wasn't reversible error. It certainly wasn't. And Dr. Dingell does not argue in this appeal to the contrary. If there was any inappropriate or if there was any excess of evidence relating to his relationships with these other women, it was harmless. Okay. So for those reasons, Your Honors, we would ask that the convictions and sentences of Dr. and Mrs. Dingell be affirmed. Thank you. All right. Thank you, Mr. Bass. You both ran out of time. If you have anything else to say, I'll give you a minute apiece. Thank you so much, Judge. I appreciate that. I just want to say, in closing, that mere performing acts that advance a scheme to defraud or a crime, performing acts, participating, as the government keeps saying, it can list 100 things that she did to participate in this. But if she doesn't know about the fraud, that's insufficient evidence to convict her. And it has to be sufficient evidence beyond a reasonable doubt. So I would just ask the Court to really take a careful look at this and see whether all the government's evidence is really going towards her knowledge of the fraud, which is what they had to prove. And also just to repeat that she is a 77-year-old woman who has spent the last nine months of her life in a federal prison. And if this Court is inclined to agree with our position, I would just ask that she be released as soon as possible. Thank you very much. All right. Thank you. And Mr. Stiller, anything further? I appreciate the opportunity, but no thank you. All right. Well, let me thank you on behalf of the Court, both of you, Mr. Stiller and Ms. Eisenman, for accepting these appointments. It's of great help to us and, I believe, great help to your clients. Thanks as well to Mr. Bass. We'll take the case under advisement, and the Court is going to take a brief five-minute or so recess.